## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| John Yong Tang, Faris Al Kooheji, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CITIC Capital Holdings Ltd., Harbin Pharmaceutical Group Holding Co., Ltd., Harbin Pharmaceutical Group Co., Ltd.,   ZT Biopharmaceutical LLC, Yichen Zhang, Kenneth A. Martindale, Tricia K. Tolivar, Hsing Chow, Rachel Lau, Michele S. Meyer, Alan Wan,  Yong Kai Wong, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Robert F. Moran, Evercore Inc.,  Gregory Berube, ABC Company, John Doe, <br><br> Defendants. | Civil Action No. 2:21-cv-17008 <br><br><br><br> **AMENDED CLASS ACTION COMPLAINT** <br> **AND JURY DEMAND** |

John Yong Tang and Faris Al Kooheji ("Plaintiffs"), by and through their undersigned counsel, bring this action on behalf of themselves and all others similarly situated against Defendant CITIC Capital Holdings Ltd., Harbin Pharmaceutical Group Holding Co., Ltd. Harbin Pharmaceutical Group Co., Ltd., Yichen Zhang, Kenneth A. Martindale, Tricia K. Tolivar, Hsing Chow, Rachel Lau, Michele S. Meyer, Alan Wan,  Yong Kai Wong, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Robert F. Moran, Evercore Inc., ABC Company and John Doe.

Plaintiffs make the following allegations pursuant to the investigation of their counsel and the extensive interviews and discussion with the former executives, former employees and consultants, the domestic and international franchisees, the suppliers, the shareholders of GNC Holdings, Inc. ("GNC"), the financial professionals familiar with GNC's financial dealings,

potential investor of GNC debt, as well as the people affiliated with Defendant CITIC Capital Holdings Ltd. Plaintiffs also make the following allegations based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## INTRODUCTION

1.      This Complaint concerns the  unlawful schemes by a number of state-owned Chinese corporations and individuals, GNC's Directors of the Board and senior management, certain GNC's secured lenders and financial advisor to conspire with each other to enrich themselves at the expense of Plaintiffs and others similarly situated minority shareholders through racketeering activities, conspiracy, fraud, breach of fiduciary duty, negligence, and conversion.

## NATURE OF THE ACTION

2.      Plaintiffs bring this class action lawsuit on behalf of all similarly situated minority shareholders of GNC who owned Class A Common Stock during February 13, 2018 and June 23, 2020, excluding entities and individuals named as Defendants in this action.

3 .      Plaintiffs contend that Defendants CITIC Capital Holdings Ltd., Harbin Pharmaceutical Group Holding Co., Ltd. Harbin Pharmaceutical Group Co., Ltd., Yichen Zhang, Kenneth A. Martindale, Tricia K. Tolivar, Hsing Chow, Rachel Lau, Michele S. Meyer, Alan Wan,  Yong Kai Wong, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Robert F. Moran, Evercore Inc., ABC Company and John Doe  violated the Racketeer Influenced And Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1961, *et seq.* and the New Jersey Racketeer influenced And Corrupt Organizations Act ("NJRICO"), N.J.S.A. § 2C:41-1, *et seq.*

4 .    Plaintiffs contend that Defendants CITIC Capital Holdings Ltd., Harbin Pharmaceutical Group Holding Co., Ltd. Harbin Pharmaceutical Group Co., Ltd., Yichen Zhang, Kenneth A. Martindale, Tricia K. Tolivar, Hsing Chow, Rachel Lau, Michele S. Meyer, Alan Wan,  Yong Kai Wong, Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Robert F. Moran, Evercore Inc., ABC Company and John Doe  perpetrated a fraud on the Plaintiffs and all  similarly situated minority owners of GNC.

5.    Plaintiffs contend that Defendants Harbin Pharmaceutical Group, the majority and controlling shareholder of GNC and its designated Directors of the Board of GNC, namely, Hsing Chow, Rachel Lau, Michele S. Meyer, Alan Wan and Yong Kai Wong have breached the fiduciary duty owed to Plaintiffs and all similarly situated minority owners of GNC.

6.    Plaintiffs contend that Defendants Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Robert F. Moran have breached the fiduciary duty owed to Plaintiffs and all similarly situated minority owners of GNC.

7.    Plaintiffs contend that the gross negligence by Defendants Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott, Robert F. Moran have caused grave detriment to Plaintiffs and all similarly situated minority owners of GNC.

## JURISDICTION AND VENUE

8.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the Plaintiffs' cause of action is pursuant to the Federal Civil RICO, U.S.C. § 1961, et seq.

9.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members

of the Class, and the aggregated claims of the individual class members exceeds $5,000,000, exclusive of interest and costs.

10.     The venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## **PARTIES**

11.     Plaintiff John Y. Tang ("Tang") is a citizen of the State of New Jersey, residing at 655 Summit Ave, Hackensack, NJ 07601. Plaintiff Tang was a minority shareholder of GNC who owned up to approximately 7.88% of GNC class A common stock in all relevant period of time. Plaintiff Tang was the biggest individual shareholder of GNC.

12.     Plaintiff Faris Al Kooheji ("Kooheji") is a citizen of Bahrain. Plaintiff Kooheji was a minority shareholder of GNC. Plaintiff Kooheji and entities controlled by him owned up to approximately 2.36%  GNC class A common stock in all relevant period of time.

13.     Defendant CITIC Capital Holdings Ltd., ("CITIC") is part of CITIC Group Corporation Ltd. ("CITIC Group"). CITIC Group, formerly known as China International Trust Investment Corporation, is one of the most important state-owned investment companies of China. Defendant CITIC is a global private equity firm with $35 billion assets, mostly from China, under management. Defendant CITIC's U.S. office is located at Ste 540, 410 Park Ave, New York, NY 10022. Defendant CITIC controls Defendants Harbin Pharmaceutical Group Holding Co. Ltd. ("Hayao Holding") and Harbin Pharmaceutical Group Co., Ltd. ("Hayao"). Defendant CITIC devised, planned, and executed the unlawful scheme to use Hayao and Hayao Holding as the front to seize GNC  at the expenses of the Plaintiffs and similarly situated minority owners of GNC.

14.     Defendant Harbin Pharmaceutical Group Holding Co. Ltd. is the controlling shareholder of Defendant Harbin Pharmaceutical Group Co., Ltd., which is a state-owned pharmaceutical company in China. Defendant CITIC is the controlling shareholder of Defendants Hayao Holding and Hayao.

15.     Defendant ZT Biopharmaceutical LLC ("ZT") is incorporated in the State of Delaware, with the principal address at 300 Sixth Ave, Pittsburg, PA 15222. Defendant ZT is the wholly owned subsidiary of Defendant Hayao Holding for the sole purpose of acquiring the GNC assets through unlawful schemes.

16.     Defendant Yichen Zhang ("Zhang") is the Chairman and CEO of Defendant CITIC.  Defendant Zhang is also the Chairman of Defendant Hayao. Defendant Zhang married the granddaughter of Yiren Rong, the former Vice President of China and the founder and Chairman of CITIC Group. Defendant Zhang is the mastermind of the unlawful scheme alleged herein.

17.     Defendant Kenneth A. Martindale ("Martindale") was the Chairman and CEO of GNC in all relevant period of time. Defendant Martindale is the mastermind of the unlawful scheme alleged herein.

18.     Defendant Tricia K. Tolivar ("Tolivar") was the CFO of GNC in all relevant period of time. Defendant Tolivar worked closed with Defendant Martindale to perpetrate the unlawful scheme alleged herein.

19.     Defendant Hsing Chow, Rachel Lau, Michele S. Meyer, Alan Wan, and Yong Kai Wong (collectively "Hayao Directors") were the Directors of the Board of GNC as designated by Defendant Hayao in all relevant period of time.

20.     Defendant Alan D. Feldman, Michael F. Hines, Amy B. Lane, Philip E. Mallott,

Robert F. Moran (collectively "Senior Directors")were the Directors of the Board of GNC in all relevant period of time.

21.     Defendant Evercore Inc. (the "Evercore"), through Evercore Group LLC, advised GNC on debt restructuring and bankruptcy in all relevant period of time. Defendant Evercore participated in the scheme alleged herein.

22.     Gregory Berube ("Berube") is Senior Managing Director in Evercore's Restructuring and Debt Advisory Group. Defendant Berube participated in the scheme alleged herein.

23.     Fictious Defendant ABC Company is the GNC's secured creditor or creditors, who have colluded with Board and Management and provided to GNC Board and Management financial incentives and other benefits and have shorted GNC stock to suppress the stock price in order to seize GNC or its assets at the expenses of Plaintiffs.

24.     Fictious Defendant John Doe is the individual or individuals who are affiliated with fictious Defendant ABC Company and participated or aid and abet in the scheme alleged herein.

25.     Defendant CITIC, Defendant Hayao Holding, Defendant Hayao, Defendant ZT, Defendant Zhang, and Defendant Hayao Directors are referred to hereinafter collectively as Defendant CITIC group.

26.     Defendant Martindale, Defendant Tolivar and Defendant Senior Directors are referred to hereinafter collectively as Defendant GNC Management.

27.     Defendant Evercore and Defendant Berube are referred to hereinafter collectively as Defendant Evercore.

## FACTS

### A.  The Background of GNC

28.     GNC, headquartered in Pittsburgh, PA,  is a leading global health and wellness brand that was founded in 1935. The brand touches consumers worldwide by providing its products and services through company-owned retail locations, domestic and international franchise locations, digital commerce and wholesale and retail partnerships across the globe.  GNC's diversified, multi-channel business model has worldwide reach. At the time of the bankruptcy filing on June 23, 2020, GNC had 7,300 stores worldwide, including 5,200 retail locations in the United States and the remainder are locations in approximately 50 countries.

29.     GNC was a public company listed on NYSE.

30.     GNC's last available 10-K is for 2019, which shows $1.650 billion in assets, $1.646 billion in debt, $2.07 billion in revenue, and $35.1 million net loss. GNC's number of outstanding Class A common stock shares is 83,720,000 as of December 31, 2019.

31.     GNC's Board of Directors was constituted of long-time GNC insiders who own near-zero GNC stock and do not care about or serve the shareholders' interest, let alone the minority shareholders who did not have any representative on the Board. GNC stock has lost over 90% value under their watch and continued the downward gyration to zero after CITIC and Hayao joined the Board.

32.     In 2013, GNC amassed over $1 billion high-interest debt primarily due to the borrowing for share buyback approved by the Board. Since then, the lender, which is constituted of a group of private equity and hedge fund firms, has exerted enormous influence on the Board and management. The interest payment has depleted the profit from the business operations.

33.     Defendant GNC Management have treated GNC as if their personal property. They

appeared to have uncontrolled power over GNC. Every year the Board has approved exorbitant compensation package to the directors and the senior management that is vastly detached from GNC's business performance. In 2019, GNC's market value dropped under $100 million, but the directors received compensation between $215,671 and $261,149; Defendant Martindale received $7.11 million; Defendant Tolivar received $2.11 million. In the meantime, Defendant GNC Management have enjoyed lavish perks, e.g., private jet, while letting the corporate cost run rampant.

34.     GNC, under the control of Defendant GNC Management, has a long history of regulatory actions and lawsuits against it and its predecessors. In 2019, several class actions were filed against GNC around the country based on allegations that GNC's false sale deceived customers into believing items were being offered at discounted price. Those cases were ultimately consolidated in the Western District of Pennsylvania for settlement purpose, Carter et al. v. General Nutrition Centers, Inc., 16-cv-633 (W.D. Pa.) and settled for $6 million in December 2019.

35.     On April 16, 2020, a class action lawsuit GNC commenced in the U.S. District Court for Central District Court of California Docket No. 2:20-cv-03545, alleging that GNC falsely portrayed a less desirable type of joint-health supplement as the preferable formulation of glucosamine.  The lawsuit was stayed due to GNC's bankruptcy filing in June 2020.

36.     GNC has extorted the franchisee store owners to purchase exclusively through its wholesale platform at price higher than retail by threatening the revocation of franchise agreement. Also, GNC threatened the franchisee store owners that their franchise licenses would be revoked unless they stopped selling non-GNC products. Further, GNC threatened the franchisee store owners that their franchise licenses would be revoked unless they entered into lease directly with the landlord as against the prior agreement.

37.     There were numerous incidents of GNC stopped paying contractor and vendors and threatened to revoke the agreements.

38.     Since October 2016, GNC has attracted many potential buyers, including a group led by the former executives of GNC, private equity firm KKR, and  a long list of Chinese Companies. The Chinese companies include Fosun Group, a Shanghai-based conglomerate, ZZ Capital International Ltd., Zhejiang NHU Co., Ltd. and SinoPharm. All proposed buyouts were valued  at least around $4 billion. GNC Board and Management's response was GNC is not for sale.

**B.   The CITIC Scheme**

39.     In and around July 2017, CITIC began discussion with GNC about a joint venture in China and an investment in or buyout of GNC.

40.     On July 18, 2017, CITIC and GNC entered into a Confidentiality Agreement to move ahead with the discussion.

41.     On October 11, 2017, Hayao Holding and GNC entered into a Confidentiality Agreement to continue the discussion.

42.     CITIC's attempt to acquire GNC in its entirety met with unsurmountable resistance from GNC Board and Management, about which the Periscope Magazine in China published an interview with Defendant Zhang (the "Zhang Interview") on February 27, 2021. During the interview, Defendant Zhang was asked why Hayao Holding only obtained "40.1%[*sic*]" GNC ownership, not the controlling stake. Zhang responded that "[w]e did not get the controlling stake of GNC because GNC was a public company, the large shareholders did not want to sell. We would not be able to complete that transaction if we insisted on controlling stake." The reporter followed with the question "At that time, you wanted to get controlling stake, but the GNC Management was not willing to negotiate?" Zhang responded "Correct, GNC Management and The Board did not want to. So 40% of GNC share

was the maximum percentage they wanted to sell."

43.     Accordingly, CITIC devised and implemented the alternate scheme, aiming at acquiring GNC ant minimum cost through a sequence of strategic moves.

44.     As the first strategic move, CITIC proposed a $300 million investment in GNC in exchange for (i) formation of a joint venture between GNC and Hayao in China with the exclusive use of GNC brand, which effectively acquires GNC's lucrative Chinese business; (ii) GNC issues and sells the new convertible preferred stock to Hayao, which will give Defendant CITIC 41.02% voting right on as-converted basis.

45.     The investment would give CITIC 5 out of 11 seats on the Board and super voting and veto power for various key corporate matters because the approval thereof requires a Two-Thirds Majority of the Board. Such matters include: (i) any alteration, amendment or repeal (whether by merger, consolidation, operation of law or otherwise) of any provision of the Company Charter or other Company organizational documents, including the bylaws, in a manner inconsistent with this Agreement; (ii) any creation of a committee of the Board, or the delegation of authority to any committee of the Board (other than a committee constituted of independent directors formed with respect to a matter for which one or more Directors has recused themselves due to a conflict of interest); (iii) any extraordinary purchase, repurchase or redemption of capital stock; (iv) any appointment or removal of any Director, otherwise than in accordance with the Company's organizational documents and this Agreement; (v) any increase or decrease of the Total Number of Directors; (vi) any payment of any extraordinary dividend or other extraordinary distributions by the Company; (vii) the acceptance of any Acquisition, other than with respect to a sale of 100% of the Equity Securities of the Company to a third party in a transaction in which all stockholders of the Company receive the same per share consideration; (viii) (A) any amendment or modification of the Convertible Notes Indenture that would result in a reduction in

the "Conversion Price" or an increase in the "Conversion Rate", each as defined therein, for the Convertible Notes causing a conversion price per share of Common Stock that is less than the Conversion Price for the Convertible Preferred Stock or (B) any conversion of the Convertible Notes into Common Stock, or repurchase or redemption of the Convertible Notes in exchange for Common Stock, at a conversion or purchase price per share of Common Stock that is less than the Conversion Price for the Convertible Preferred Stock; (ix) any issuance of any Equity Security senior to or *pari passu* with the Convertible Preferred Stock; (x) the commencement of bankruptcy or receivership proceedings, or the adoption of a plan of complete or partial liquidation or resolutions providing for a complete or partial liquidation, dissolution, or winding up of the Company; (xi) the removal or replacement of the chief executive officer, president, chief financial officer, secretary, treasurer or any other executive officer; (xii) the incurrence of Indebtedness in excess of $10,000,000 in respect of any single transaction or in a series of related transactions; or (xiii) any New Issuance of New Securities in excess of $10,000,000 in respect of any single transaction or in a series of related transactions.

46.     It is clear both Defendant CITIC group and Defendant GNC Management have to agree on the commence of bankruptcy, the restructuring of the corporate debt, the conversion of the corporate bonds, new investment in GNC and the compensation to the Directors and senior management.

47.     Defendant CITIC group knew that GNC's Chinese business by itself is worth more than $300 million. Defendant CITIC group's strategic investment in GNC will enable CITIC group to profit enormously from the Chinese market and more importantly to obtain the control of the GNC Board and the access to GNC 's valuable inside information in order to complete CITIC group's scheme to acquire GNC in its entirety.

48.     Defendant CITIC group effectively eliminated the possibility of any tender offer for or investment in GNC from a third party by virtue of CITIC group's 41.02% ownership and its control of

the Board.

49.     Also, CITIC group eliminated the possibility that GNC refinances its debt with a third party because (i) CITIC group, by itself, can easily refinance the debt; and (ii) Defendant CITIC group benefits the most from the refinancing of GNC's debt, which will drastically increase the value of CITIC group's stake in GNC. No other party would be interested in doing this service for CITIC group especially when CITIC group is capable of doing so itself.

50.     The foregoing conclusion is supported by Defendant Berube's Declaration (the "Berube Declaration") to the bankruptcy court on October 13, 2020 that "[B]eginning in the third quarter of 2019, Evercore, along with the Debtors' other advisors, assisted the Debtors with an extensive marketing process targeted to US based investors in order to secure commitments to refinance the Debtors' funded debt obligations. As part of this process, the Debtors conducted a non-deal roadshow during which they and their advisors met with approximately 50 potential investors. In addition to the US marketing process, Evercore assisted the Debtors in exploring options with certain Asia-based lenders for a comprehensive refinancing package. At the same time, Evercore reached out to 12 financial and strategic buyers that it believed could be potential bidders for the Debtors' Assets. The Debtors did not receive any actionable proposals from either the refinancing or the strategic marketing process."

51.     On February 13, 2018, Defendant CITIC group completed its first strategic move when Defendant CITIC group entered into a Securities Purchase Agreement (the "Security Purchase Agreement") with GNC, pursuant to which GNC agreed to issue and sell to Defendant CITIC group 299,950 shares of a newly created Series A Convertible Preferred Stock for an aggregate of approximately $300 million. The Convertible Preferred Stock is convertible into GNC's common stock at a conversion price of $5.35 per share. Defendant CITIC group will own 41.02% of GNC on as-converted basis. Although preferred stockholders usually do not have voting

rights, Defendant CITIC group will have 41.02% voting right on as-converted basis. The transaction valued the GNC equity at approximately $750 million.

52.     The Securities Purchase Agreement provide the address for Hayao Holdings as: c/o CITIC Capital Holdings Limited, 28/F, CITIC Tower, 1 Tim Mei Avenue, Central, Hong Kong SAR, Fax: +85225238312, Attention: Eric Xin, Yong Kai Wong, Hans Allegaert.

53.     Pursuant to the Securities Purchase Agreement, GNC and Defendant CITIC group will form a joint venture in China that would be controlled 65% by Defendant CITIC group and 35% by GNC.

54.     On March 6, 2018, at GNC's town hall meeting with employees, Defendant Martindale made various remarks about the Security Purchase Agreement with CITIC group, "[w]e entered into an agreement with CITIC and Hayao, a Chinese firm." "CITIC is a Chinese private equity firm that owns a controlling stake in Hayao, which is one of the largest pharmaceutical brands in China. After many months of evaluation and some very diligent negotiations, we entered into an agreement to enter into a joint venture with Hayao." "So that is the joint venture part of the story. But there is a bit more – there is the $300M preferred convertible equity investment we announced." "[w]e reviewed and evaluated offers from many potential domestic and international partners. In the end, the offer from CITIC and Hayao not only had the best terms, but also created a great deal of synergy because of the JV opportunity we were working on." "CITIC's passion for GNC is infectious. They feel very strongly about the power of the GNC brand—not only in China but across the globe." "Once the transaction closes, we will expand the size of our Board of Directors from 8 directors to 11. Our new board will have 5 members nominated by the current Board of Directors, 5 members nominated by CITIC and me."

55.     On May 17, 2018, GNC's stockholders approved the proposal to issue convertible preferred shares to Defendant CITIC group.

56.     On November 7, 2018, GNC and Defendant CITIC group entered into an Amendment to the Securities Purchase Agreement, pursuant to which GNC and Defendant CITIC group agreed to complete the transaction in three steps. (i)100,000 shares of Preferred Stock will be issued on November 9, 2018 for a total purchase price of $100,000,000 ("Initial Issuance"); (ii) 50,000 shares of Preferred Stock will be issued on December 28, 2018 for a total purchase price of $50,000,000 ("Second Issuance"); and (iii)149,950 shares of Preferred Stock will be issued on February 13, 2019 for a total purchase price of $149,950,000 ("Third Issuance").

57.     On November 8, 2018, GNC and Defendant CITIC group consummated the Initial Issuance and entered into a Stockholders Agreement. This Stockholders Agreement was not approved by the GNC shareholders.

58.     Under this Stockholders Agreement, Defendant CITIC group, must vote "(a) affirmatively in favor of the election of each Investor Designee nominated to serve as a Director in accordance with this Agreement, (b) except in a Contested Election, affirmatively in favor of the election of each Company Designee and the CEO Designee nominated to serve as a Director in accordance with this Agreement, and (c) in a Contested Election, either, at the election of such Investor Entities, (i) consistent with the recommendations of the Board or(ii) in the same proportion as the Voting Securities not Beneficially Owned by Investor Entities are voted (including, if applicable, by written consent, or by voting by ballot or by submitting any alternative proxy card necessary …" GNC has never had a Contested Election since the date of this Stockholders Agreement.

59.     This is by the design of GNC Board and Defendant Martindale to secure their precarious positions with Defendant CITIC group's voting power in exchange for the favorable treatment to CITIC group. In so doing,  Defendant CITIC group and Defendant GNC Management

are in absolute control of GNC's corporate fairs and are able to do whatever they desire without any consideration of Plaintiffs' interest.

60.     On January 2, 2019, GNC and Defendant CITIC group consummated the Second Issuance pursuant to the terms of the Securities Purchase Agreement.

61.     On January 22, 2019, the Board, upon designation by Defendant CITIC group, appointed Hsing Chow and Yong Kai Wong to the Board, effective January 22, 2019. Since 2015, Chow has served as Group Vice President of Hayao. Since 2012, Wong has served as Managing Director of CITIC.

62.     On February 13, 2019, GNC and Defendant CITIC group consummated the Third Issuance pursuant to the terms of the Securities Purchase Agreement.

63.     Thereafter Defendant CITIC group and GNC formed the China joint venture in Hong Kong. Defendant CITIC group have not put in meaningful efforts to develop the Chinese business since its inception. Defendant CITIC group's primary goal is GNC.

64.     On March 1, 2019, GNC entered into a Master Transaction Agreement to sell Nutra Manufacturing, LLC, which operates the Company's manufacturing business ("Nutra"), to International Vitamin Corporation ("IVC"), the U.S. subsidiary of Aland Nutraceutical Group in China. The parties agreed to a series of transactions, the immediate result of which was IVC's acquisition of a 57.14% stake in Nutra for an aggregate purchase price of $101 million, with GNC initially retaining a 42.86% interest in Nutra ("Remaining Interests"), which would be sold to IVC eventually in equal installments on or around each of the next four anniversaries of the date of the Initial Sale, for an aggregate purchase price of $75 million. The first installment of $18.75 million is due on or around March 1, 2020 to provide additional liquidity to GNC during the Pandemic. Moreover, GNC can accelerate the entire payment of $75 million in early 2020 when the Pandemic

hit.

65.     In addition, GNC and IVC agreed to make a capital contribution to Nutra in an aggregate amount of $25,000,000 after IVE acquires the initial 57.14% stake in Nutra, paid on a pro rata basis in accordance with each of GNC and IVC's respective ownership interests in Nutra. IVC further agreed to repay GNC's capital contribution upon the closing of the final sale of Seller's Remaining Interests. GNC can accelerate the repayment of this approximately $10.7 million capital contribution to gain additional liquidity during the Covid-19 Pandemic.

66.     GNC ended first quarter 2019 with $211 million in liquidity, $137.1 million in cash and $888.4 million in long-term debt.

67.     On April 8, 2019, GNC appointed Defendant Michele S. Meyer ("Meyer") to the Board. Meyer was designated by Defendant CITIC group.

68.     Throughout 2019, GNC's financial condition continued to improve but the stock price kept tumbling primarily due to the investors' loss of confidence in GNC Board and Management as well as the heavy short-selling by short seller, including Defendant ABC Company that has access to GNC inside information.

69.     On September 30, 2019, GNC's cash and cash equivalents were $121.9 million, and debt was $858.6 million. No borrowings were outstanding on the $100 million Revolving Credit Facility at the end of the third quarter of 2019.

70.     GNC announced that it was reviewing a range of refinancing options, including discussions with financing sources in the United States and Asia, to further optimize the GNC's capital structure and enhance its financial flexibility. GNC also announced that it was pleased with its progress in reviewing refinancing options and expects to complete the process in the fourth quarter of 2019.

71.     At the 3rd Qtr. 2019 earnings release conference call on October 24, 2019, Martindale stated, "In early 2018, we committed to a long-term process to reduce our leverage. Since that time we've reduced debt by over $440 million and lowered our net total leverage ratio from five times to 3.6 times … As mentioned on last quarter's call, we recently conducted numerous meetings with current and potential debt and equity holders. These meetings have led to productive and ongoing discussions and we believe that we are closing in on a longer-term resolution for our capital structure."

72.     Tolivar added, "[w]e continue to expect free cash flow for 2019 to range from $90 million to $100 million … As I described in my remarks last quarter and noted in our press release earlier today, we are in the process of reviewing a range of refinancing options to further optimize our capital structure and enhance our financial flexibility. This work builds on the progress we made over the past year, as we reduced our indebtedness by approximately $400 million … We are working with an independent committee of the Board, supported by independent financial and legal advisers as we conduct a review and have had a series of discussions with financing sources in the United States and Asia. We are pleased with progress to-date. And while there can be no assurances, we are on track to complete our process in the fourth quarter … we spent a good part of the third quarter talking to dozens of different financing options and now we're in the stage where we're even very prudent working with independent committee to evaluate those options and select the best one in the interest of the shareholders that are driving that value. So from a confidence perspective, we're doing all that we can to get this closed as quickly as possible. We want to be prudent through that process as we do so."

73.     Those statements are contradictory to the Berube Declaration that "[T]he Debtors did not receive any actionable proposals from either the refinancing or the strategic marketing

process."

74.     In the meantime, Defendant CITIC group continued to solidify its control over GNC and narrow GNC's options for refinancing. Defendant CITIC group leaked to the media the false information of its bid to take GNC private for the purposes to derail GNC's refinancing talks with other parties. On October 22, 2019, Bloomberg reported that "GNC's Chinese investor, Hayao, was considering a potential bid to take the GNC private, people with knowledge of the matter said. The Chinese company has been speaking with potential advisers about an offer for GNC, the people said, asking not to be identified because the information is private. GNC has lost more than half its value over the last year, giving it a market capitalization of $176 million at Monday's close. The company had nearly $900 million of debt at the end of June, according to a recent investor presentation."

75.     The false information of possible buyout of GNC terminated all the ongoing talks for debt refinancing but the only one involving CITIC.

76.     In December 2019, Defendant CITIC group and Tolivar held meetings in Hong Kong.

77.     Neither GNC nor Defendant CITIC group provided any update on the debt refinancing or buyout in the 4th Quarter of 2019. By the end of December 2019, it was clear that Defendant CITIC group was the only possibility for GNC's debt refinancing.

78.     On January 22, 2020, GNC appointed Defendant Rachel Lau and Alan Wan to the Board. Defendant Lau and Wan were designated by Defendant CITIC group. By then Defendant CITIC group was in control of GNC's Board and its choices of debt refinancing.

**C.   The Bankruptcy Scheme**

79.     Defendant GNC Management knew Defendant ABC Company and other secured

lenders' goal to acquiring GNC or its assets.

80.     Filing for Chapter 11 has been one of the plans for Defendant GNC Management for a long time. Such filing will result in Defendant ABC Company and other secured lenders to obtain GNC.

81.     According to GNC's SEC filing, as of December 31, 2019, GNC's total consolidated long-term debt (including current portion) was $862.6 million, including $159.1 million principal amount of 1.5% convertible senior notes due (the "Notes"), $448.5 million on our Tranche B-2 Term Loan (the "Tranche B-2 Term Loan") due in 2021, and $275 million on our asset-based Term Loan (the "FILO Term Loan") due in 2022.

82.     For years, GNC have been paying excessive amount of interest to Defendant ABC Company and other secured lenders. On March 31, 2020, the Company's contractual interest rates under the Tranche B-2 Term Loan, the FILO Term Loan and the Revolving Credit Facility were 10.1%, 8.0% and 4.0%, respectively.

83.     Defendant GNC Management was unwilling or/and failed to permanently restructure the debt and thus removed the threat of Defendant ABC Company and other secured lenders.

84.     Tranche B-2 Term Loan Spring Maturity Covenant requires that all outstanding amounts under the convertible senior notes exceeding $50.0 million have been repaid, refinanced, converted or effectively discharged prior May 2020. Otherwise the maturity date of the Tranche B-2 will accelerate from 2021 to May 16, 2020 (the "Springing Maturity Date").

85.     GNC needed $109.1 million by May 2020 to satisfy this Springing Maturity Covenant.

86.     GNC retained Defendant Evercore as its financial advisor in late 2018. The effort

was led by Defendant Gregory Berube, a bankruptcy specialist and a Senior Managing Director at Evercore.

87.     Defendant GNC Management, Defendant CITIC group and Defendant Evercore started working on the Chapter 11 case in the beginning of 2020. The record show that GNC has paid approximately $49.63 million professional fees and other expenses in relation to the Chapter 11 case in the first and second Quarters of 2020.

88.     Defendants GNC Management and Defendant CIITC group claimed that GNC filed for Chapter 11 because GNC did not have approximately $109.1 million in cash, or in other alternative way, to resolve the springing maturity issue.

89.     Springing maturity covenant is common but bankruptcy filing caused by springing maturity is extremely rare.

90.     Many options were available for Defendants to resolve the springing maturity issue. GNC could have (i) reduced the outstanding Notes amount to less than $50 million using cash on hand; (ii) used the loan that Plaintiffs offered, at least $70 million; (iii) accelerated the installment payment from IVC for the sale of Nutra in an aggregated amount of approximately $59 million, and the repayment of capital contribution of $10.7 million; (iv) negotiate with Notes holder to convert approximately $100 Notes, which is a viable option to Notes holders who will face total loss in case of the bankruptcy filing; (v) sought loan  under the Main Street Expanded Loan Facility that the Federal Reserve established on April 9 2020 to help business during Pandemic, for which GNC could draw up to 150 million at a low interest cost of SOFR +250-400bps; (vi) draw from the existing revolving credit facility, which has the low 4% interest rate; (vii) negotiate with lender for the waiver of springing maturity covenant; (viii) default on the term loan and negotiate with the lenders for more favorable terms. Any of those option will give a better result to Plaintiffs and

other minority shareholders. But Defendants failed to do any of those. Defendants chose, not forced, the worse option for Plaintiffs and other minority shareholders, but the best for their own interest.

91.     The record shows that GNC had $137 million cash on March 31, 2020 and $127 million on May 11, 2020. GNC had enough cash or had other options to work with the Notes holders to neutralize Springing Maturity. But Defendants have done nothing to address the springing maturity issue.

92.     Instead, enormous amount of cash, $49.63 million, has been spent on professional fees and other expenses in relation to Chapter 11 case in the first half of 2020.

93.     Defendant GNC Management has spent an enormous amount of cash on professional fees and other expenses in relation to the Chapter 11 case in the first half of 2020, when GNC only needed $109.1 million to satisfy the Springing Maturity Covenant. From January 1, 2020 to June 23, 2020 (the "Petition Date") when GNC filed for bankruptcy, the professional fees in relation to the Chapter 11 Cases were $34.2 million, which Defendants buried in selling, general and administrative charges. From June 24, 2020 to June 30, 2020, the professional fees and expenses in relation to the Chapter 11 Cases were $15.43 million, which were recorded as separate reorganization items. In total, Defendants has spent $49.63 million on the Chapter 11 cases as of June 30, 2020.

94.     Large amount of cash was paid to Defendant ABC Company and other lenders. GNC made an excess cash flow payment of $25.9 million to Defendant ABC Company and other lenders in April 2020.

95.     Five days before the Chapter 11 filing, Defendants Martindale and Tolivar were awarded $2,194,000 and $795,000 retention bonus respectively, and an additional $918,000 bonus

to other executives so they can stay with GNC through the bankruptcy proceeding. Without the bankruptcy filing, it is reasonable to expect that there would be no such windfall to Defendants Martindale and Tolivar.

96.     Despite such massive bleeding of cash, GNC maintained positive cash flow in first half of 2020.

97.     On March 16, 2020, GNC delayed the filing of Annual Report on Form 10-K for 2019 because GNC failed to secure a refinancing deal. GNC would not have sufficient cash flows from operations to fully repay the indebtedness under the Notes or the Tranche B-2 Term Loan when they become due on the Springing Maturity Date.

98.     The news drove down the GNC's equity value or market capitalization to lower than $50 million.

99.     On March 24, 2020, GNC received Defendant CITIC group's decision not to refinance the Notes and Tranche B-2 Term Loan in the amount of nearly $600 million. During the Zhang Interview published on February 27, 2021, Zhang elaborated on this subject that "we found that GNC' interest payment for debt was tracking high, the necessary changes were not implemented … one way to reduce the cost is to refinance the high-interest debt, which is forming a new lending group, mainly Chinese banks, to get rid of the existing high-interest loan. However, in the middle of the refinancing the Pandemic hit and thus we accomplish the goal of reducing the high-interest debt though bankruptcy."

100.    On March 25, 2020, GNC filed the belated 10-K Annual Report for 2019. GNC reported consolidated revenue of $470.4 million in the fourth quarter of 2019. Cash provided by operating activities was $97 million for 2019; Full year 2019 free cash flow was $81 million and Adjusted EBITDA was $192 million. Reduced debt by $290 million during 2019 and ended fourth

quarter of 2019 with $183 million in liquidity.

101.    During the morning conference call on the next day, Martindale and Tolivar said, "[w]e continue to review a full range of options to refinance our capital structure in both the U.S. and Asia." ""We will continue to explore all options to refinance and restructure our indebtedness." Tolivar declined, though, to "make assurances" that refinancing would be possible.

102.    GNC disclosed that GNC continued to evaluate all strategic alternatives to address upcoming springing maturities, including refinancing options in the U.S. and Asia, and if GNC were unable to refinance the debt, GNC may need to consider additional actions including: (i) Raising additional capital through short-term loans; (ii) Implementing additional restructuring and cost reductions; (iii) Raising additional capital through a private placement or other transactions; (iv) Disposing of assets; (v) Selling or licensing intellectual property. But except for (ii), Defendant GNC Management had no intention to take those actions because the only goal for them at that time was to file the Chapter 11 case.

103.    Although Defendant GNC Management stated they were actively seeking options to presumably avoid the bankruptcy filing, they did not. Instead, GNC Defendants, CITIC, Hayao, and Evercore conspired to file for the sham bankruptcy. All Defendants have determined the Bankruptcy filing will bring them the most monetary benefits.

104.    GNC have temporarily closed approximately only 25% of its U.S. and Canada company-owned and franchise stores as of March 23, 2020 due to the Covid-19 Pandemic. During this temporary closure, GNC continued to serve its customers through its e-commerce sites. The inventory in the closed stores was transferred to the store that remained open.

105.    In the meantime, GNC stopped replenishing inventory and stopped paying contractors and vendors. GNC stopped rebate payment to franchisee stores. GNC also withheld

rent beginning in April 2020 for some retails stores. As of June 30, 2020, GNC had unpaid rent of approximately $47 million. All those methods preserve the cash on hand and raised the GNC's liquidity.

106.    On April 3, 2020, GNC announced GNC Management had implemented measures to reduce expenses and maintain flexibility to manage through these challenging times, including A reduction in operating expenses including a hiring freeze, eliminating corporate merit increases and other cost saving initiatives. A decrease in the number of field leadership roles as the company continues to optimize the store fleet. Reducing costs across the business with the exception of digital capabilities. Temporary furloughs for a significant portion of our store and corporate associates across all levels of the organization.

107.    All those measures that were presented by Defendant GNC management as to cut cost, raise cash and protect the long-term prospect of GNC were actually in preparation of the Chapter 11 case.

108.    Those measures were meant to increase the net intrinsic value of GNC at others' expenses so that Defendant GNC Management can hand over to Defendant ABC Company and other Tranche B-2 Term Loan lenders through Chapter 11 case in exchange for a fat reward package, including retention bonus and 10% common stock in the new restructured company

**D.   Plaintiffs' Actions to Save GNC**

109.    Many people contacted Plaintiff Tang since mid of 2019, including follow shareholders, GNC employees, franchise store owners, contractors, vendors, potential lenders, financial professionals and others who were affiliated with GNC. Many described Defendant GNC Management as self-dealing, incompetent and arrogant, expressing great concerns about Defendant GNC Management.

110.    On April 14, 2020, Tang established GNC Shareholder Advocacy Group (the "SAG"), an email list of concerned shareholders and others when Defendant CITIC group and Defendant GNC Management's intent and actions not to protect the interest of minority shareholders became clear.

111.    On the same day, 2020, Tang dispatched a letter to Defendants Martindale and Moran. The letter urged the Board and the management to leverage everything in their power to resolve the pressing liquidity issue and avoid the filing of bankruptcy. The letter also proposed to have an open and candid discussion about the long-term prospect of the Company in the future, including:

- Restructuring of corporate indebtedness
- Disposing of non-core assets
- Sale of the Company
- Corporate governance in alignment with shareholder interest
- Executive compensation
- Stock price enhancement
- New business strategy and initiatives
- Permanent cost control and reduction
- Improvement of investor relationship

112.    On April 15, 2020, Martindale responded to Tang's letter: "Rest assured that our Board is actively engaged, working hard to explore all alternatives to preserve and maximize the value of the Company."

113.    On April 17, 2020, Tang emailed to Martindale the information about the Federal Reserve's Main Street Expanded Loan Facility Program, which provides low-interest loan to aid business hit by the Pandemic.

114.    On April 19, 2020, Tang dispatched the second letter to Martindale, seeking response to certain extremely disturbing information and allegations from various reliable sources Those allegations include, but not limited to:

25

- GNC's Board and senior management are not seeking any solutions to the T2 spring maturity issue while several options are available, and instead are actively working with the lenders on the bankruptcy filing. I was told that GNC has positive free cash flow in the 1st Qtr. 2020 even in the midst of the coronavirus pandemic.
- GNC's Board and senior management colludes with the GNC creditors to defraud the shareholders for the purposes of orderly and gradually sinking GNC into bankruptcy and into the hands of GNC creditors at the minimum cost.
- GNC's Board and senior management deliberately rejected several tender offers in the past few years to serve towards the GNC creditors' ultimate goal of stealing the company at the expenses of the shareholders.
- GNC's senior management has purposefully not restructured the long-term debt in the best interest of the Company and engineered several default risks in the past few years to facilitate the seemingly inevitable bankruptcy filing in the interest of GNC creditors.
- GNC's senior management conspires with the GNC creditors to drive down the stock price so that crumbles, if any, to the shareholders from the bankruptcy proceeding constitutes a premium.
- GNC's Board and senior management's clear Breach of fiduciary duty owed to the shareholders on the grounds of their numerous actions on record.

115.    In the letter, Tang stated "I kindly ask for your response by April 21, 2020. Otherwise, I must proceed to announce  the investigation of those allegations as I am compelled to instigate."

116.    No response from Martindale has been received. On April 22, 2020, Plaintiffs announced the investigation into the actions of GNC's Board and management in the press release.

117.    In the press release, Tang also proposed a public sale of GNC, stating that "GNC's true and fair value can only be determined and unlocked by the public sale. GNC is a leading global powerhouse of health and nutritional products with revenue of $2.07 billion, EBITDA of $191.8 million and net cash flow of $96.5 million in 2019. GNC has approximately $100 million in cash, $45 million receivable from IVC and $871.2 million in debt as of today.  In the United States, the average value of enterprise value to EBITDA (EV/EBITDA) in the retail and trade sector as of 2020 was a multiple of approximately 13.4x, 22.8x for online retail. A more conservative multiple of 10 would still give GNC an enterprise value of $1.918 billion and a net

value of $1.19 billion after cash and debt, not counting China joint venture. By contrast GNC's current market capitalization is less than $35 million." "GNC has never been offered for sale but nevertheless has seen several attempts of acquisition in the past.  A public sale of GNC could attract companies like P&G (PG), Nestle (NSRGY), Hershey's (HSY), Amazon (AMZN) and other health/nutritional products companies domestic or international. The right buyer has the opportunity to acquire GNC at a low price, financing through the issuance of low yield bond or low interest loan." "The public sale is the only way to protect the shareholders from the possible collusion of the insiders, including the Board and Management, the creditors and CITIC(HKSE: 00267)/Harbin Pharmaceutical. CITIC/Harbin completed the $300 million investment for preferred stock to be converted to 40% of GNC common stock at $5.35/share. Currently CITIC/Harbin has 5 directors.  A backroom deal will embolden the Board and Management to push for the sham bankruptcy. The insiders will reap all the benefits of the bankruptcy, wiping out or greatly diluting the shareholders' stake. As the result, the insiders would own the debt-free GNC for less than $1 billion." "The public sale is warranted by the complete loss of confidence in the Board and Management. There shall be no doubt that this Board and Management do not serve the best interest of the shareholders. GNC's stock performance may not reflect the true value of GNC but it does indicate the ineptness of the Board and Management. Despite the mismanagement of GNC and constant injection of uncertainty and confusion in the market by the surprising, misleading and conflicting press releases one after another, the Board and Management rewarded themselves with $250K compensation to the directors and multiple million compensation to the Management when the GNC stock becomes penny stock and the employees earn minimum wages."

118.    Fitch analysts said in a note published in June 2020 that they believe that "despite its challenges, GNC has a viable position in the retail marketplace, as a segment leader in the

vitamin, mineral and health supplement space with good brand recognition, a sticky customer base, and positive cash flow."

119.    On April 22, 2020, Martindale wrote back that "[A]s we have previously informed you, the board of directors, the special committee and the management team are committed to maximizing the value of the company for the benefit of all stakeholders." Also, Martindale claimed that Tang is "in violation of US federal securities laws" and "[T]he Company reserves its rights with respect to these apparent violations" in an attempt to intimidate and threaten Tang.

120.    On April 22, 2020, GNC received the written notice from NYSE that the Company was no longer in compliance with the listing requirements.

121.    GNC announced that GNC intends to timely notify the NYSE of its intent to present a plan to cure the Market Capitalization Deficiency and restore its compliance with the NYSE continued listing standards. But in fact, GNC had no intend to present the plan or to cure the deficiency because GNC Management and CITIC group already decided to file bankruptcy.

122.    Plaintiffs have discussed about the options to protect their investment. Tang contacted the  companies that previously approached GNC for buyout and potential lenders for GNC. But no one is interested, citing the difficulty in dealing with Defendant GNC Management, Defendant GNC Management's clear intent to favor secured lenders, and Defendant CITIC Group's involvement.

123.    Also, Tang had discussion with  a private equity firm for a potential buyout of GNC and reached out to Defendant CITIC group through a third party to explore the possibility of purchasing Defendant CITIC group's stake in GNC. Defendant CITIC group's response was negative.

124.    Plaintiffs continued to explore all options to save GNC. Plaintiff Kooheji led the

lender consortium to offer the loan to GNC. On April 27, 2020, Plaintiff Kooheji emailed to Martindale to offer a loan as follows:

> "…
>
> I hope you are keeping safe during this pandemic. I am a large shareholder of GNC (below 5%) & I've been following up with GNC's struggle in Re-financing there secured loan. The argument & disappointment in how we got in this liquidity crisis should be postponed for now, As I strongly believe in the company's potential E-commerce growth. I do not know more then what GNC has already released publicly on the re-financing struggle. If you were able to successfully secure a federal grant/assistance; I am unaware. Assuming GNC will default on there payment terms due to insufficient cash, I would like to potentially over some sort of **mezzanine financing** or **bridge loan**. Of course the JPMorgan FILO & B2 loan will remain SENIOR to my proposed offer. I am happy to hear any potential offers from your side as well. My priority is to NOT see GNC Default & render my common equity shares worthless.
> …"

125.    On April 28, 2020, Defendant Berube acknowledge the receipt of the offer by email. On May 5, 2020, a conference call was set up to discuss Kooheji's offer, during which Kooheji said the lender consortium would be comfortable to offer $30 - 40 million and would accommodate if GNC needed more. Defendant Berube did not give any information about GNC's needs but indicated there could potentially be another lender. After the conference call, Berube did not make any further contact.

126.    On May 11, 2020, GNC released earnings report for 1st Qtr. 2020. GNC reported consolidated revenue of $472.6 million in the first quarter of 2020, compared with consolidated revenue of $564.8 million in the first quarter of 2019. The decrease in revenue was largely due to the closure of company-owned stores under the store portfolio optimization strategy, sales declines during the second half of March due to the COVID-19 pandemic, the transfer of the Nutra manufacturing to the Manufacturing joint venture ("Manufacturing JV"), U.S. company-owned negative same store sales and lower domestic and international franchise revenue. E-Commerce revenues grew approximately 25% compared with the first quarter of 2019 driven by improved

site performance and increased demand related to COVID-19. Implemented e-commerce order management system early in the first quarter of 2020 and accelerated ship from store capabilities in over 100 locations in the second quarter of 2020. Launched curbside pickup in the first quarter to allow our customers to continue to receive their needed GNC products while enabling social distancing. Due to impacts of COVID-19, the company has significantly reduced inventory purchases and capital expenditures, as well as taken action to decrease costs by nearly $40 million in 2020 consisting of employee furloughs, marketing reductions, store hours reductions and deferral of non-essential spend. The company continued to evaluate all strategic alternatives to address upcoming debt maturities, including refinancing and restructuring options. For the first quarter of 2020, the Company reported a net loss of $200.1 million compared with net loss of $15.3 million in the prior year quarter. Excluding non-cash long-lived asset impairment charges and certain other expenses as outlined in the table below, adjusted net loss was only $11.0 million in the current quarter, compared with adjusted net income of $19.0 million in the prior year quarter.

127.    In the conference call on May 11, 2020, Tolivar provided the details on GNC's financial condition, "We ended the quarter with $137 million in cash, which includes $30 million in borrowings under our revolving credit facility. First quarter free cash flow decreased $16 million in the quarter, mainly due to a decrease in operating income and unfavorable changes in working capital. In April, we drew another $30 million on our revolving credit facility, and as of today, we have $127 million in cash on hand. In terms of our capital structure, we're exploring several options to refinance and restructure debt. While we continue to work through alternatives to address these maturities, we cannot make any assurances regarding the likelihood, certainty or exact timing of any alternatives. Additionally, substantial doubt exists regarding our ability to reduce the amount of outstanding under the convertible notes to less than $50 million by May 16, 2020, a requirement

to avoid the springing maturity of the B-2 Term Loan, the FILO and the revolving credit facility. Failure to complete a refinancing or other out-of-court restructuring, obtain an extension of the springing maturity or to reach an agreement with required lender group's under the credit agreements prior to May 16, 2020 with respect to the springing maturity or to otherwise reach an agreement with the company's stakeholders on the terms of an out-of-court restructuring would have a material adverse effect on the company's liquidity, financial condition and results of operations and may result in filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in order to implement, which is expected to be renegotiated restructuring plan. We are currently in discussion with the lenders to move the springing maturity and believe the parties will see, it is in everyone's best interest to do so. This will, by no means, be an easy year for GNC, regardless of our past as we continue to optimize our store footprint, reduce costs and reopen our temporarily closed stores. We expect adjusted EBITDA performance to improve in the back half of 2020. This does assume the impact of COVID-19 continues to lessen over time rather than a return to lockdown across the globe."

128.    Defendant Martindale and Tolivar avoided questions  on the conference call

129.    On May 11, 2020, Martindale send a letter to employee and franchisee, preparing them for the bankruptcy, "[w]e are exploring all options available to address our capital structure. As part of this process, we are working closely with our key stakeholders to come to resolution that will allow us to address our capital structure – which has been exacerbated by the current pandemic. Many strategic alternatives are being thoughtfully considered by GNC and its advisors, including potentially filing for voluntary protection under Chapter 11 of the U.S. Bankruptcy Code. Bankruptcy can seem like a scary word, but I want to be clear that all of the strategic alternatives that GNC is considering contemplate that GNC's door will remain open. Even if GNC were to file

for Chapter 11 bankruptcy (and it bears repeating that no such decision has been made), we will continue operating while addressing our balance sheet." Shortly after, this email quickly disappeared from GNC's email system according to a source.

130.    In the wake of the earning release, Plaintiffs decided to approach Zhang and CITIC again to propose a joint effort to save GNC. At that time, Plaintiffs and other shareholders that were in contact with Plaintiff owned approximately 13% of GNC stock. Together with CITIC and Hayao's 41.02%, the joint efforts will result in the control of GNC. Tang also discussed with former GNC executives about possibly forming a new management team. In response to Tang's proposal, Zhang responded through a person affiliated with CITIC, "not now, maybe later".

131.    Also, on May 14, 2020, Kooheji followed up with Berube, keep pushing the loan offer after several day of non-responsiveness from GNC. Kooheji offered  $70 million or more to GNC as an unconditional loan, stating that GNC did not need anything near that amount to prevent the springing maturity. Kooheji urged Berube to respond immediately. GNC had $127 million in cash on May 11, 2020, which, with the additional loan from Plaintiffs, would be more than enough to reduce the outstanding Notes balance down to less than $50 million and thus would eliminate the springing maturity issues and the possibility of bankruptcy.

132.    Defendant Berube did not respond.

**E.    The Bankruptcy Filing and the Sale to CITIC**

133.    On May 15, 2020, GNC announced that it has reached an agreement with required lender groups to extend the springing maturity dates from May 16 to August 10, 2020, subject to certain conditions that, if not met, would cause the extended springing maturity date to move forward to June 15, 2020.

134.    On June 12, 2020, GNC and Lenders agreed to extend the springing maturity date

again from June 15, 2020 to June 30, 2020.

135.    Defendants GNC Management released the news about extension of the springing maturity date to the public to create the impression that they were working on a solution to the springing maturity, but in fact, they only need those extension to secure the best compensatory package to themselves and to grab the greatest monetary benefit from the bankruptcy.

136.    On June 23, 2020 (the "Petition Day"), GNC filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code.

137.    The bankruptcy restructuring deal between Defendant GNC Management and ABC Company would completely wipe out the GNC shareholder. But it will greatly benefit Defendant ABC Company, GNC Management and Evercore that collect significant amount of fees. After the restructuring, Defendant ABC Company and other Tranche B-2 Term Loans lenders will own 100% of the new company's common stock. Defendant ABC Company and other Tranche B-2 Term Loans lenders awarded 10% of the new company's common stock to Defendants Martindale, Tolivar and other senior managers. Defendants GNC Management were to be retained as well.

138.    At the last minute before the filing, Defendant CITIC group  and GNC reached an agreement for a stalking horse bid of $760 million to acquire GNC's assets, including $126 million cash as of the closing date and approximately $60.7 million future payment from. Defendant CITIC group would complete the purchase with $400 million fund provided by Bank of China and assumption of GNC debts in the amount of $360 million.

139.    Under the proposed bankruptcy plan, GNC assets will be auctioned off publicly for which Defendant CITIC group provide the minimum bid. In case the CITIC group purchase of GNC assets does not consummate, Defendant GNC Management will proceed with the restructuring deal with secured lenders.

140.    Included in the bankruptcy filing is a Restructuring Support Agreement (the "RSA"), pursuant to which Defendant ABC Company and other Tranche B-2 Term Loan lenders would provide debtor-in-possession financing, which is supposedly to support GNC's business operations through the pendency of the Chapter 11 case.

141.    Pursuant to RSA, Defendant ABC Company and other Tranche B-2 Term Loan Lenders will provide $100 million "New Money" as the DIP Term Loan Facility. As of June 30, 2020, GNC has drawn $30.0 million, of which $15.7 million was held in escrow in accordance with terms of the DIP Term Loan Credit Agreement, while paid $7.3 million DIP financing. As a result, GNC actually only received $7 million of "New Money" from DIP Term Loan.

142.    In the six months ended June 30, 2020, the net cash flow provided by operating activities is -$3.44 million. This includes the $49.63 million professional fees and expenses in relation to the Chapter 11 case, without which GNC has a positive cash flow approximately $46.19 million.

143.    The record shows that no borrowings were outstanding on the $100 million Revolving Credit Facility as of June 30, 2020.

144.    As of June 30, 2020, GNC has an adequate amount of cash. The cash, cash equivalents and restricted cash was $96.43 million as of June 30, 2020, compared to $67.22 million as of December 2018, $95.89 million as of June 30, 2019 and $117.05 million as of December 31, 2019, respectively. The record shows GNC's liquidity has improved since March 31, 2020.

145.    GNC's liquidity continued to improve through the pendency of Chapter 11 case despite little help from DIP financing. GNC's cash and cash equivalents at the Closing of CITIC group's purchase on October 7, 2020 was $126 million. The cash and cash equivalents increased a $29.57 million from $96.43 million to $126 million when the Chapter 11 case was pending.

146.    After the bankruptcy filing, GNC paid more than $10 million per month or a total of over $30 million for professional fees and expenses in relation to the Chapter 11 case according to Defendant Zhang.

147.    Defendant ABC Company and other Tranche B-2 Term Loan lenders were committed to provide $70 million "new money" as DIP Term Loan when the Chapter 11 case was pending. Although the amount of GNC's actual borrowing was not disclosed, even assuming the unlikely case the GNC had drawn the entire $70 million from DIP term loan, most of which would have been spent on the $30 million plus professional fees and expenses in relation to the Chapter 11 case and the $29.57 million of increase in cash.

148.    GNC would have been in a better financial position without bankruptcy filing and DIP financing, which cost GNC at least $100 million.

149.    A group of Notes holders objected to GNC's Chapter 11 plans according to bankruptcy court filing. They took aim at GNC's DIP financing, expressing concerns about how much of GNC's DIP financing loan rolled up pre-bankruptcy debt by replacing it and, potentially, giving Defendant ABC Company and secured lenders priority treatment through the Chapter 11 proceeding. Also, there were concerns about rushing through the bankruptcy process as dictated by the DIP milestones. "Without showing any necessity therefor, the Debtors [i.e., GNC] have agreed to aggressive milestones which permit their senior creditors to take advantage of a temporary dip in value because of the impact of Covid-19," the Note holders said in their objection, while asking for more time for "sufficient marketing of the Debtors business and assets in order to maximize recovery for all stakeholders."

150.    There are other concerns. On September 10, 2020, Sen. Marco Rubio on Thursday urged a national-security review panel to scrutinize a Chinese company's attempt to buy GNC. In

a letter to U.S. Treasury Secretary Steven Mnuchin, Sen. Rubio (R., Fla.) noted that Pittsburgh-based GNC keeps health data on millions of U.S. customers. Should the company be acquired by Hayao or another Chinese buyer, that data could fall into the hands of China's authoritarian government, Mr. Rubio said. "The acquisition of a major health and nutrition chain with over 5,200 retail stores in the United States and an expansive customer base presents the opportunity for state-directed actors to purchase this information legally," said Mr. Rubio, who has focused on the threat that Chinese acquisitions of U.S. companies pose to national security. Mr. Rubio asked for a review of the potential transaction by the Committee on Foreign Investment in the U.S., a Treasury-led panel that includes representatives from more than a dozen federal agencies. "The Chinese government engages in persistent efforts to obtain a broad range of sensitive American personal data through illicit means such as state-sponsored theft from government agencies and private companies."

151.    In order to ensure that Defendant CITIC group obtain the GNC, Defendants CITIC group and GNC Management conspired with Evercore to provide manipulated financial data projecting the disappointing GNC's financial performance in the future in order to deter the potential bidders. Evercore and GNC set up an extensive virtual data room (the "VDR") that consisted of confidential financial, business, and legal due diligence information regarding the GNC assets. Fifteen potential bidders executed the non-disclosure agreements and accessed the VDR, including funds and banks that approach Evercore and GNC at Plaintiffs' request. The comments of those who reviewed the GNC financial projection on the VDR were that the data did not add up.

152.    According to the court filing, Defendant Evercore contacted or was contacted by more than 150 potential domestic and international purchasers, but none proceeded to the bidding.

153.    Despite the fact that GNC has been an attractive acquisition target historically, Defendant Evercore and Defendant GNC Management could not even find one actionable proposal among over 200 potential buyers in approximately one year leading to the bankruptcy auction.

154.    On October 7, 2020, the GNC and Defendant CITIC group consummated the Closing of sale of GNC assets. At the Closing, CITIC group, indirectly through ZT Biopharmaceutical LLC, a Delaware limited liability company and wholly owned subsidiary of Hayao, purchased 100% of the issued and outstanding equity interests in New GNC.

155.    According to the bankruptcy court filing, "Proceeds from the Closing are being used to, among other things, pay off (a) all amounts owing under the $100 million Debtor-in-Possession Term Loan Credit Agreement, by and among GNC Corporation, General Nutrition Centers, Inc., GLAS Trust Company, LLC, as administrative agent and collateral agent, and the lenders party thereto, (b) the $100 million of roll-up term loans under the Amended and Restated Term Loan Agreement, dated as of February 28, 2018, among GNC Corporation, General Nutrition Centers, Inc., JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, and (c) all amounts owing under the $275 million Debtor-in-Possession Amended and Restated ABL Credit Agreement, by and among GNC Corporation, General Nutrition Centers, Inc., JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, and the lenders party thereto … Following the Closing, the Debtors will seek an order from the Bankruptcy Court confirming the Debtors' Joint Chapter 11 Plan of Reorganization (the "Plan"), pursuant to which, among other things, the Debtors expect to distribute approximately (a) $126 million in cash (subject to reduction for certain amounts that may need to be escrowed in connection with the confirmation of the Plan) and $184 million in second lien notes (subject to increase to take account of any cash reduction in accordance with the terms of the Stalking Horse Agreement) issued by

New GNC to the Company's Tranche B-2 term lenders (which, together with the $100 million term loan roll-up described above, would constitute an approximate recovery of $410 million to the Company's Tranche B-2 term lenders) and (b) $4.5 million in cash and $20 million in subordinated notes to be issued by New GNC to the Debtors' unsecured creditors. The Plan also contemplates that all outstanding shares of its common stock and preferred stock will be cancelled under the Plan, with shareholders receiving no distributions thereunder".

156.    The Notes holders received $20 million in new convertible Notes, which is to be converted to the common stock of New GNC as early as 2023 at a conversion price of $2.25 billion divided by the fully diluted outstanding number of shares. This provides a reference to the value of GNC.

157.    By then, Defendant CITIC group completed its scheme to acquire the valuable GNC assets. In so doing, Defendant CITIC group, the controlling shareholder with insider information of GNC, unlawfully maximized its own benefit at the expenses of Plaintiffs and other minority shareholders.

158.    All Defendants have unlawfully enriched themselves at the expenses of Plaintiffs and other minority shareholders.

## COUNT ONE

### (Claims Under the Federal Civil RICO, U.S.C. § 1961, *et seq*. ("RICO") Against All Defendants)

159.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

160.    GNC was owned by Plaintiffs and other shareholders but was controlled by Defendants.

161.    Defendants violated RICO and deprived Plaintiffs' rights and interest in GNC.

Plaintiff was injured as a result.

162.  Defendants, through GNC, sought to extort and did extort GNC franchisees by threatening them that their franchise licenses would be revoked unless they continued to procure inventory from GNC at a higher price than GNC's own online retail prices. The Franchisees had no choice if they wanted to keep the GNC stores.

163.  Also, Defendants sought to extort and did extort GNC franchisees by threatening them that their franchise licenses would be revoked unless they stopped selling non-GNC products.

164.  Further, Defendants sought to extort and did extort GNC franchisees by threatening them that their franchise licenses would be revoked unless they entered into lease directly with the landlord as against the prior agreement.

165.  Moreover, Defendants did not pay some GNC's vendors but sought to extort and did extort those vendors by threatening them with the termination of business relationship and no-payment unless the vendors continued to supply goods and service.

166.  Defendant Martindale, Defendant Tolivar, devised and implemented the scheme of self-dealing and depriving Plaintiffs of their interest in GNC through at least two racketeering activities in violation of the provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(A) and 18 U.S.C. § 1961(1)(B).

167.  Defendant Senior Directors, Defendant Evercore, Defendant Berube, Defendant ABC Company and Defendant John Doe participated in the above schemes through at least two acts of racketeering activities in violation of the provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(A) and 18 U.S.C. § 1961(1)(B).

168.  Defendants' unlawful schemes converged at the fabrication and completion of the sham Chapter 11 bankruptcy filing.

169.    Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

170.    GNC is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

171.    GNC, as the enterprise, has engaged in, and its activities have affected, inter-state and foreign commerce.

172.    In furtherance of this scheme,  Defendants used the Internet, U.S. Mail and/or other interstate carrier to disseminate false information to Plaintiffs, other shareholders, employees, contractors, franchise store owner, vendors across the United States and the world.

173.    The acts of Defendants, as set forth in detail above, constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(A) and18 U.S.C. § 1961(1)(B), consisting of:

(a)    "extortion" within the meaning of 18 U.S.C. § 1961(1)(A);

(b)    violations of Title 18 U.S.C. §1961(1)(B), including, but not limited to, repeated violations 8 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1557 (engaging in monetary transactions in property derived from specified unlawful activity).

174.    Defendants have engaged in a pattern of racketeering activity. Defendants, each of whom are corporation or person associated with, employed by, or affiliated with the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

175.    Defendants have engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§1961(1), 1961(5), because, as described above, they have engaged in the foregoing

incidents of racketeering activity during the period 2018-2020, including mail fraud, wire fraud, theft, extortion, fraudulent practices, fraudulent crimes, and other acts intended to obtain and maintain control over GNC, and to deprive Plaintiffs of their rights and interests in GNC. The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein. The incidents of racketeering activity were related to each other in that they had the same or similar effects, results, participants, methods of commission, victims, and purpose (the control and destruction of GNC, and the deprivation of rights of Plaintiffs in GNC), and were not isolated incidents, and such incidents of racketeering activity continued over a significant period of time from February 2018 through October 2020.

176.    In violation of 18 U.S.C. § 1962(c), Defendants, through a pattern of racketeering activity, have acquired and maintained direct control of GNC, an enterprise which is engaged in or activities of which affect interstate and foreign trade or commerce.

177.    Plaintiffs have been damaged in their property (including, but not limited to, their interests in GNC) by reason of Defendants violations of 18 U.S. Code § 1962 and, as a result, are entitled to recover three-fold their damages suffered, plus attorney's fees and costs, pursuant to 18 U.S. Code § 1964(c) ; and are entitled to be awarded all other remedies provided for pursuant to 18 U.S. Code § 1964(a), including, but not limited to:

(a)   Ordering Defendants to divest themselves of any interest, direct or indirect, in any enterprise;

(b)   Imposing reasonable restrictions on the future activities or investments of Defendants, including but not limited to, prohibiting any of them from engaging in the same type of endeavor found to be in violation of 18 U.S. Code § 1962;

(c)   Ordering the restitution of any moneys or property unlawfully obtained or retained by Defendants found to be in violation of 18 U.S. Code § 1962;

(d)   Assessing civil monetary penalties against Defendants of three times the amount of their gain as a result of their violation of 18 U.S. Code § 1962; and

(e)   Ordering Defendants to forfeit their interests they have acquired or maintained in violation of 18 U.S. Code § 1962, and any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprises they have established, operated, controlled, conducted or participated in.

## COUNT TWO

### (Claims Under the RICO, U.S.C. § 1961, *et seq*., RICO Conspiracy Against All Defendants)

178.   Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

179.   As set forth above Defendants, and each of them, knowingly, willfully, and unlawfully conspired with each other to facilitate the schemes that included the operation of management of a RICO enterprise through a pattern of racketeering activity in violation of 18 U.S. Code § 1962.

180.   The purpose of the conspiracy is to drive GNC to the sham bankruptcy for Defendants' own benefits.

181.   Plaintiffs have been damaged in their property, including, but not limited to, their interests in GNC, by reason of Defendants' violations of 18 U.S. Code § 1962 , and as a result, are entitled to recover three-fold their damages suffered, plus attorney's fees and costs, pursuant to 18 U.S. Code § 1964(c); and are entitled to be awarded all other remedies provided for pursuant to 18 U.S. Code § 1964(a), including, but not limited to:

(a)  Ordering Defendants to divest themselves of any interest, direct or indirect, in any enterprise;

(b)  Imposing reasonable restrictions on the future activities or investments of Defendants, including but not limited to, prohibiting any of them from engaging in the same type of endeavor found to be in violation of 18 U.S. Code § 1962;

(c)  Ordering the restitution of any moneys or property unlawfully obtained or retained by Defendants found to be in violation of 18 U.S. Code § 1962;

(d)  Assessing civil monetary penalties against Defendants of three times the amount of their gain as a result of their violation of 18 U.S. Code § 1962; and

(e)   Ordering Defendants to forfeit their interests they have acquired or maintained in violation of 18 U.S. Code § 1962, and any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprises they have established, operated, controlled, conducted or participated in.

## COUNT THREE

**(Claims Under the New Jersey Influenced and Corrupt Organization Act ("NJ RICO"), N.J.S.A. § 2C:41-1, *et seq.*, Against All Defendants)**

182.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

183.    GNC was owned by Plaintiffs and other shareholders but was controlled by Defendants.

184.    Defendant violated NJ RICO and deprived Plaintiffs' rights and interest in GNC. Plaintiff was injured as a result.

185.    Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of N.J.S.A. § 2C:41-1.

186.     GNC is an "enterprise" within the meaning of N.J.S.A. § 2C:41-1(c).

187.     GNC, as the enterprise, has engaged in, and its activities have affected, inter-state and foreign commerce.

188.     In furtherance of this scheme, Defendants used the Internet, U.S. Mail and/or other interstate carrier to disseminate false information to Plaintiffs, other shareholders, employees, contractors, franchise store owner, vendors across the United States and the world.

189.     The acts of Defendants, as set forth in detail above, constitute "racketeering activity" within the meaning of N.J.S.A. § 2C:41-1(a), because Defendants and those they conspired with, engaged in fraudulent practices, wire fraud, mail fraud, extortion and other conduct defined under N.J.S.A. §§ 2C:41-1(a)(1) and (2), consisting of:

(a)      violations under Chapter 20 of Title 2C of New Jersey Statutes, including, but not limited to, violations of: N.J.SA. § 2C:20-4 (theft by deception);

(b)      "extortion" within the meaning of N.J.S.A. § 2C41:1(a)(1)(h); and

(c)      fraudulent practices and fraudulent crimes under Chapter 21 of Title 2C of New Jersey Statues, including, but not limited to, violations of: N.J.S.A. § 2C:21-7 (making false or misleading statements for the purpose of securing property or money); § 2C:21-9(c) (knowingly using, controlling or operating any corporation for the furtherance of any unlawful object); § 2C:21-10(1), (2) and (3) (knowingly accepting anything of value to influence the acts of a partner, fiduciary, director; officer or manager of any corporation or other legal entity).

(d)      violations of Title 18 U.S.C. §1961(1)(B), including, but not limited to, repeated violations 8 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1557 (engaging in monetary transactions in property derived from specified unlawful activity);

44

190.     Defendants have engaged in a pattern of racketeering activity. Defendants, each of whom are corporation or person associated with, employed by, or affiliated with the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

191.     Defendants have engaged in a "pattern of racketeering activity" within the meaning of N.J.S.A. § 2C:41-1(d), because, as described above, they have engaged in the foregoing incidents of racketeering activity during the period 2018-2020, including mail fraud, wire fraud, theft, extortion, fraudulent practices, fraudulent crimes, and other acts intended to obtain and maintain control over GNC, and to deprive Plaintiffs of their rights and interests in GNC. The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein. The incidents of racketeering activity were related to each other in that they had the same or similar effects, results, participants, methods of commission, victims, and purpose (the control and destruction of GNC, and the deprivation of rights of Plaintiffs in GNC), and were not isolated incidents, and such incidents of racketeering activity continued over a significant period of time from February 2018 through October 2020.

192.     In violation of N.J.S.A. § 2C:41-2(b), Defendants, through a pattern of racketeering activity, have acquired and maintained direct control of GNC, an enterprise which is engaged in or activities of which affect interstate and foreign trade or commerce.

193.     Plaintiffs have been damaged in their property, including, but not limited to, their

interests in GNC, by reason of Defendants violations of <u>N.J.S.A.</u> § 2C:41-2(b) and, as a result, are entitled to recover three-fold their damages suffered, plus attorney's fees and costs, pursuant to <u>N.J.S.A.</u> § 2C:41-4(c); and are entitled to be awarded all other remedies provided for pursuant to <u>N.J.S.A.</u> § 2C:41-4(a), including, but not limited to:

(a)  Ordering Defendants to divest themselves of any interest, direct or indirect, in any enterprise;

(b)  Imposing reasonable restrictions on the future activities or investments of  Defendants, including but not limited to, prohibiting any of them from engaging in the same type of endeavor found to be in violation of <u>N.J.S.A.</u> § 2C:41-2;

(c)  Ordering the restitution of any moneys or property unlawfully obtained or retained by Defendants found to be in violation of <u>N.J.S.A.</u> § 2C:41-2;

(d)  Assessing civil monetary penalties against Defendants of three times the amount of their gain as a result of their violation of <u>N.J.S.A.</u> § 2C:41-2; and

(e)   Ordering Defendants to forfeit their interests they have acquired or maintained in violation of <u>N.J.S.A.</u> § 2C:41-2, and any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprises they have established, operated, controlled, conducted or participated in.


### **COUNT FOUR**

### **(Claims Under NJ RICO, N.J.S.A<u>.</u> § 2C:41-1, *et seq.*, RICO Conspiracy Against All Defendants)**

194.   Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

195.   As set forth above Defendants, and each of them, knowingly, willfully, and unlawfully conspired with each other to facilitate the schemes that included the operation of

management of a RICO enterprise through a pattern of racketeering activity in violation of N.J.S.A. § 2C:41-2(d).

196.    The purpose of the conspiracy is to drive GNC to the sham bankruptcy for Defendants' own benefit.

197.    Plaintiffs have been damaged in their property, including, but not limited to, their interests in GNC, by reason of Defendants' violations of N.J.S.A. § 2C:41-2(d), and as a result, are entitled to recover three-fold their damages suffered, plus attorney's fees and costs, pursuant to N.J.S.A. § 2C:41-4(c); and are entitled to be awarded all other remedies provided for pursuant to N.J.S.A. § 2C:41-4(a), including, but not limited to:

(a)  Ordering Defendants to divest themselves of any interest, direct or indirect, in any enterprise;

(b)  Imposing reasonable restrictions on the future activities or investments of Defendants, including but not limited to, prohibiting any of them from engaging in the same type of endeavor found to be in violation of N.J.S.A. § 2C:41-2;

(c)  Ordering the restitution of any moneys or property unlawfully obtained or retained by Defendants found to be in violation of N.J.S.A. § 2C:41-2;

(d)  Assessing civil monetary penalties against Defendants of three times the amount of their gain as a result of their violation of N.J.S.A. § 2C:41-2; and

(e)   Ordering Defendants to forfeit their interests they have acquired or maintained in violation of N.J.S.A. § 2C:41-2, and any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprises they have established, operated, controlled, conducted or participated in.

**COUNT FIVE**

**(Claim of Fraud Against Defendants CITIC, Hayao Holding, Hayao, Zhang, Hayao Directors, Martindale, Tolivar, Senior Directors, Evercore, and Berube)**

198.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

199.    Defendants CITIC, Hayao Holding, Hayao Directors knowingly and intentionally misled Plaintiffs by failing to disclose their scheme to obtain GNC's assets by driving GNC to the sham bankruptcy.

200.    Defendants Martindale, Tolivar, Senior Directors knowingly and intentionally misled Plaintiffs by disseminating false information and concealing their scheme to drive GNC to the sham bankruptcy to their own benefits.

201.    Defendant Evercore and Berube knowingly and intentionally disseminated false information and participated in the above scheme to their own benefits.

202.    Plaintiffs have been damaged in their property, including, but not limited to, their interests in GNC, by reason of Defendants' unlawful and fraudulent acts and are entitled to recover compensatory damages suffered and punitive damages sufficient to deter Defendants from committing such lawful and fraudulent conducts in the future, plus attorney's fees and costs.


## COUNT SIX

**(Claim of Conspiracy to Defraud Against Defendants CITIC, Hayao Holding, Hayao, Zhang, Hayao Directors, Martindale, Tolivar, Senior Directors, Evercore, and Berube)**

203.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

204.    Defendants CITIC, Hayao Holding, Hayao Directors, Martindale, Tolivar, Senior Directors, Evercore, Berube and each of them conspired with each other to knowingly and intentionally concealed their schemes to drive GNC to the sham bankruptcy to their own benefits.

205.    Plaintiffs have been damaged in their property (including, but not limited to, their interests in GNC) by reason of Defendants' unlawful and fraudulent acts and are entitled to recover compensatory damages suffered and punitive damages sufficient to deter Defendants from committing such lawful and fraudulent conducts in the future, plus attorney's fees and costs.

## COUNT SEVEN

### (Claim of Breach of Fiduciary Duties Against Defendants Hayao, Martindale, Hayao Directors and Senior Directors)

206.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

207.    As majority shareholders, directors of GNC, Defendants Hayao, Martindale, Hayao Directors and Senior Directors owed fiduciary duties to Plaintiffs and other minority shareholders.

208.    By entering into a fraudulent scheme and conspiracy to destroy Plaintiffs and other minority shareholders' rights and interests in GNC, those defendants breached their fiduciary duties, including the duty of loyalty, to Plaintiffs.

209.    Also, by filing a sham bankruptcy that resulted in Plaintiffs' loss of rights and interests in GNC, those defendants breached their fiduciary duties, including the duty of loyalty, to Plaintiffs.

210.    As a result of these breaches, Third-Party Plaintiffs have been damaged as determined at trial.

## COUNT EIGHT

### (Claim of Conversion Against Defendants CITIC, Hayao Holding, Hayao, Zhang, Hayao Director)

211.    Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

212.   Plaintiffs, other minority shareholders and the Defendants are the owners of GNC.

213.   The Defendants only own 41.02%.

214.   The Defendants have taken Plaintiffs' interests in GNC through unlawful scheme of sham bankruptcy and fraudulent acts.

215.   As a result of these unlawful and fraudulent acts, Plaintiffs have been damaged as determined at trial.

### COUNT NINE

### (Claim of Negligence Against Defendants Martindale and Senior Directors)

216.   Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

217.   Defendants owed fiduciary duty to Plaintiffs and other minority shareholders.

218.   Defendants knew or should have known that Defendant CITIC, Hayao Holding, Hayao, Zhang, Hayao Directors devised and implemented the illegal scheme.

219.   Defendants Martindale and Senior Director's inaction with regard to the illegal scheme breached their duty and constituted negligence.

220.   Defendants Martindale and Senior Directors' negligence were the actual and proximate cause of harm to Plaintiffs.

221.   As a result of Defendants Martindale and Senior Directors' negligence, Plaintiffs have been damaged as determined at trial.

### COUNT TEN

### (Claim of Aiding and Abetting a Conspiracy Against Defendants Senior Directors, Evercore, Berube, ABC Company, John Doe)

222.     Plaintiffs repeat and reallege all prior allegations as though fully set forth herein.

223.     Defendants Senior Directors, Evercore, Berube, ABC Company and John Doe willingly aided and abetted the unlawfully conspiracy against Plaintiffs.

224.     Plaintiffs have been damaged and injured as a result of such aiding and abetting in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment for the following relief:

(a)     Awarding Plaintiffs three-fold their damages suffered, plus attorney's fees and costs, pursuant to 18 U.S. Code § 1964(c).

(b)     Awarding all other remedies provided for pursuant to 18 U.S. Code § 1964(a), including, but not limited to:

1) Ordering Defendants to divest themselves of any interest, direct or indirect, in any enterprise;

2) Imposing reasonable restrictions on the future activities or investments of Defendants, including but not limited to, prohibiting any of them from engaging in the same type of endeavor found to be in violation of 18 U.S. Code § 1962;

3) Ordering the restitution of any moneys or property unlawfully obtained or retained by Defendants found to be in violation of 18 U.S. Code § 1962;

4) Assessing civil monetary penalties against Third Party Defendants of three times the amount of their gain as a result of their violation of 18 U.S. Code § 1962; and

5) Ordering Defendants to forfeit their interests they have acquired or maintained in violation of 18 U.S. Code § 1962, and any interest in, security of, claim against, or

property or contractual right of any kind affording a source of influence over any enterprises they have established, operated, controlled, conducted or participated in.

(c)      Awarding Plaintiffs their compensatory damages against Defendants;

(d)      Awarding Plaintiffs punitive damages against Defendants;

(e)      Awarding Plaintiffs their attorney's fees and costs in this action; and

(f)      For such other and further relief as the Court deems just and proper.


## JURY DEMAND

Defendants hereby demand trial by jury on all issues triable by jury.


Dated: September 20, 2021                    Respectfully submitted,


                                             By: _____*/s/ John Y. Tang*_____
                                                          John Y. Tang

                                             John Y. Tang (N.J. SBN: 000772009)
                                             **Tang PC**
                                             655 Summit Avenue
                                             Hackensack, NJ 07601
                                             Telephone: (201) 676-0757
                                             Facsimile: (212) 981-4869
                                             john.tang@gettang.com

                                             *Counsel for the Plaintiffs*